UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TODD G. DEAN,

                Plaintiff,                              **DECISION AND ORDER**

       v.                                 6:15-CV-06239 EAW

ANDREW ROBINSON and AARON WARD,

                Defendants.

_____

## INTRODUCTION

*Pro se* plaintiff Todd G. Dean ("Plaintiff" or "Dean") asserts a claim against each of defendants Andrew Robinson ("Robinson") and Aaron Ward ("Ward") (collectively "Defendants") for deliberate indifference to his health and safety in violation of his constitutional rights. (*See* Dkt. 21). Presently before the Court are: (1) Plaintiff's motion to amend his complaint to assert a claim pursuant to the Federal Tort Claims Act (the "FTCA") (Dkt. 85), and a Report and Recommendation ("R&R") recommending denial thereof issued by Magistrate Judge Mark W. Pedersen (Dkt. 102); and (2) Defendants' motion for summary judgment (Dkt. 86).[1] For the reasons that follow, the Court adopts

---

[1]     Plaintiff also file a "Motion for Postponement" on June 27, 2022, in which he stated that he was being transferred between correctional facilities and asked the Court for "A 30 to 60 days Postponement." (Dkt. 97). It is unclear what "postponement" Plaintiff was seeking at that time, inasmuch as he had already filed his opposition to Defendants' motion for summary judgment on May 16, 2022. (Dkt. 92). Plaintiff did file an additional opposition to Defendants' motion for summary judgment on August 15, 2022 (Dkt. 104), which the Court has reviewed and considered in light of Plaintiff's *pro se* status. To the

the R&R, denies Plaintiff's motion to amend, and grants Defendants' motion for summary judgment.

## FACTUAL BACKGROUND

The following facts are taken from Defendants' Statement of Material Facts Not in Dispute (Dkt. 86-3) ("Defendants' Statement"), filed in compliance with Local Rule of Civil Procedure 56(a)(1). Plaintiff was advised that Local Rule 56 required him to submit his own "separate, short, and concise statement of the material facts" in response to this filing, and that the failure to do so could result in the facts set forth in Defendants' Statement being deemed admitted. (Dkt. 88 at 3).[2] He nevertheless failed to make such a filing. The Court has accordingly accepted Defendants' factual assertions as true to the extent that that they are supported by citations to the evidence of record.

---

extent Plaintiff was seeking any further relief in his "Motion for Postponement," it is denied.

[2]      In connection with their motion for summary judgment, Defendants provided Plaintiff with a copy of this Court's "Important Notice to Pro Se Litigants" regarding motions for summary judgment, which contains this information, as well as additional information regarding the nature of summary judgment. (Dkt. 88; Dkt. 89). The Court, in accordance with its standard practice, reiterated this information in its scheduling order. (Dkt. 90). Despite having been mailed to Plaintiff at his address of record, that scheduling order was returned as undeliverable. (Dkt. 91). Nonetheless, the notice provided by Defendants was sufficient to put Plaintiff on notice without the Court's reinforcement in its scheduling order. *See Irby v. New York City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001) ("A district court need not advise a *pro se* litigant as to the nature of summary judgment where an opposing party has already provided the litigant with the requisite notice." (alteration and citation omitted)). Indeed, there is no question that Plaintiff received Defendants' motion papers, inasmuch as he filed a response thereto. (*See* Dkt. 92).

During the time period relevant to this action, Ward was employed as a Supervisory Deputy U.S. Marshal ("SDUSM") in the Western District of New York. (Dkt. 86-3 at ¶ 3). As an SDUSM, Ward oversaw federal court proceedings in Rochester, New York, and scheduled the Deputy U.S. Marshals ("DUSMs") under his supervision. (*Id*.). Robinson was employed as a DUSM in the Western District of New York at all times relevant to Plaintiff's claims. (*Id*. at ¶ 4).

During the time period at issue, the U.S. Marshals Service ("USMS") contracted with the Monroe County Jail ("MCJ") to house detainees who had been charged with federal crimes and were under the authority of the USMS. (*Id*. at ¶ 6). Under the terms of the contract, the USMS was responsible for transporting federal detainees between the MCJ and the federal courthouse for court appearances. (*Id*. at ¶ 7).

In 1991, Plaintiff was criminally charged with raping and sodomizing a 13-year-old girl in Rochester, New York. (*Id*. at ¶ 8). He was detained at the MCJ for a number of months during the pendency of those criminal charges. (*Id*. at ¶ 9). It was common knowledge among the jail population that Plaintiff had been charged with sexual offenses involving a minor, and he was threatened and extorted by other inmates because of the nature of his criminal charges. (*Id*. at ¶¶ 10-12).

On June 19, 1992, Plaintiff pled guilty to rape in the second degree and was sentenced to five years of probation. (*Id*. at ¶ 13). After violating the terms of his probation, he was resentenced in September of 1993 to one to three years in the custody of the New York State Department of Corrections and Community Supervision ("NYS DOCCS"). Plaintiff was released to probation on May 16, 1995, but again violated the

terms of his probation, and was resentenced in February of 1996 to one to three years in NYS DOCCS' custody. (*Id*. at ¶ 14). During the time Plaintiff spent in state prison, Plaintiff's status as a sex offender was common knowledge among the inmate population. (*Id*. at ¶ 15).

Because he was a level 3 sex offender under New York law, Plaintiff was required to register with the New York State Sex Offender Registry ("NYSSOR") every 90 days. (*Id*. at ¶ 18). In July of 2014, after failing to register with the NYSSOR, Plaintiff was detained at the MCJ. (*Id*. at ¶ 19). At that time, the other inmates at the MCJ were aware that Plaintiff was a sex offender, and he was again "extorted and threatened." (*Id*. at ¶ 20).

On October 9, 2014, a criminal complaint was filed in this District charging Plaintiff with violating 18 U.S.C. §§ 2422(b), 2251(a), and 2251(e) by knowingly using online cellular text messages in an attempt to (1) persuade, induce, or entice an individual he believed to be under the age of eighteen to engage in sexual activity, and (2) persuade a minor to produce child pornography. (*Id*. at ¶ 27; *see also* Criminal Complaint, *United States v. Dean*, No. 15-cr-6064, Dkt. 1 (W.D.N.Y. Oct. 9, 2014)).

Plaintiff had his initial appearance on October 9, 2014, at which time Assistant Federal Public Defender Anne Burger ("AFPD Burger") was assigned to represent him. (*Id*. at ¶¶ 28-29). That same day, the United States Attorney's Office for the Western District of New York (the "USAO") issued a press release announcing Plaintiff's arrest. (*Id*. at ¶ 31). Rochester's daily newspaper, the Democrat and Chronicle, published an article dated October 10, 2014, in which it reported Plaintiff's arrest under the headline "Rochester sex offender faces new charges." (*Id*. at ¶ 32).

Plaintiff was detained at the MCJ in connection with his federal criminal charges. (*Id*. at ¶ 33). Plaintiff testified at his deposition that when he entered the MCJ in October of 2014, the other inmates were aware of the nature of the crime he had been charged with, because they had seen it in the newspaper and on the news. (*Id*. at ¶ 34). Plaintiff further testified that every inmate on the floor of the MCJ where he was housed knew what he was charged with, that he was concerned for his safety as soon as he was housed in the MCJ, and that he received "extortion threats" in 2014. (*Id*. at ¶ 37).

On January 29, 2015, Robinson arrived at the MCJ to transport Plaintiff to the federal courthouse in Rochester for a status conference before Magistrate Judge Marian W. Payson. (*Id*. at ¶ 44). On that date, Plaintiff was wearing a TENS unit, which is a medical device that is strapped to Plaintiff's back to alleviate pain. (*Id*. at ¶ 45). Robinson discovered the TENS unit while searching Plaintiff and contacted Ward to ask if Plaintiff was allowed to bring the device to the federal courthouse. (*Id*. at ¶ 46). Ward advised that Plaintiff was not cleared to wear the TENS unit to court, but Dean refused to leave the MCJ without it. (*Id*. at ¶¶ 47-48). It is undisputed that Robinson then said words to the effect that Plaintiff did not need a TENS unit when he rode a bicycle to a local park to meet his would-be victim in the pending criminal case. (*Id*. at ¶ 49). Judge Payson conferred with Ward, and ordered that Plaintiff be permitted to appear at future court appearances with his TENS unit. (*Id*. at ¶ 50).

On March 4, 2015, Robinson and DUSM Mark LeVeque ("LeVeque") arrived at the MCJ to transport Plaintiff to the federal courthouse for a status conference before Judge Payson. (*Id*. at ¶¶ 51-52). Robinson admits that he called Plaintiff a child molester in the

reception area of the MCJ on March 4, 2015, though the parties disagree about the specific words he used and who else was present.  (*Id*. at ¶ 53).

Upon returning to the federal courthouse, Robinson advised Ward that he had called Plaintiff a child molester while at the MCJ.  (*Id*. at ¶ 54).  Ward notified his supervisor. (*Id*. at ¶ 55).  Meanwhile, Plaintiff had complained to his attorney, AFPD Burger, about Robinson's actions.  (*Id*. at ¶ 56).

After the status conference was completed, Judge Payson contacted Ward to raise concerns about the incident between Robinson and Plaintiff.  (*Id*. at ¶ 57).  Ward met with Plaintiff, Robinson, and LeVeque in order to investigate what had happened.  (*Id*. at ¶ 58). Ward advised Robinson that his actions were not acceptable.  (*Id*. at ¶ 60).  Additionally, Ward's supervisor counseled Robinson regarding the incident, and told him to apologize to Plaintiff through AFPD Burger.  (*Id*. at ¶ 61).  Ward further advised Robinson that he should not transport Plaintiff to or from the MCJ in the future.  (*Id*. at ¶ 62).

Plaintiff claims that at his next court appearance, Robinson again arrived to transport him from the MCJ and again identified him as a child molester.  (*Id*. at ¶ 65).  Plaintiff further claims that he complained to AFPD Burger again and had a second meeting with Ward.  (*Id*.).  However, these claims are contradicted by the evidence of record.  In particular, Plaintiff's next court appearance was on March 20, 2015, for an attorney appointment hearing at which AFPD Burger was substituted by Lawrence Kasperek, Esq., as counsel for Plaintiff.  (*Id*. at ¶ 66).  Robinson cannot have transported Plaintiff on this date, as he was detailed to an assignment in St. Croix, U.S. Virgin Islands from March 15, 2015, to March 28, 2015, as confirmed by travel documents.  (*Id*. at ¶¶ 67-68).  The USMS

daily log confirms that on March 20, 2015, Ward assigned two DUSMs other than Robinson to MCJ transportation duties. (*Id*. at ¶ 69). March 20, 2015, is the last time that AFPD Burger appeared in Plaintiff's criminal case. (*Id*. at ¶ 73).

## PROCEDURAL BACKGROUND

Plaintiff commenced this action on April 23, 2015. (Dkt. 1). On February 19, 2016, the Court found that Plaintiff had failed to state a claim and dismissed his complaint. (Dkt. 11). On March 9, 2017, the Court filed a Decision and Order permitting Plaintiff to replead his claims. (Dkt. 17). Plaintiff filed his amended complaint on May 3, 2017, naming two John Doe defendants. (Dkt. 18). On September 13, 2018, the Court entered a Decision and Order screening the Amended Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a). (Dkt. 21). The Court dismissed Plaintiff's claims brought pursuant to the FTCA without prejudice, but permitted Plaintiff's deliberate indifference claims to proceed to service. (*Id*.). The Court further asked that the USAO produce information regarding the identities of the John Doe defendants (*id*.), which the USAO provided on October 3, 2018 (Dkt. 22). Service was thereafter effectuated on Ward and Robinson. (*See* Dkt. 28; Dkt. 30; Dkt. 31).

Ward moved to dismiss Plaintiff's claims against him; the Court denied that motion on December 17, 2019. (Dkt. 33; Dkt. 42). Judge Pedersen appointed Plaintiff *pro bono* counsel solely for the limited scope of conducting discovery, including depositions. (Dkt. 61). Discovery closed on January 3, 2022. (Dkt. 77).

On April 11, 2022, Plaintiff filed a "Motion to Pursue Federal Tort Claims Against the Debtors Without First Obtaining A Judgement From Claims." (Dkt. 85). Defendants

filed their opposition to this motion on May 26, 2022.  (Dkt. 93).  On July 29, 2022, Judge Pedersen entered his R&R, in which he construed the motion as a request to amend the operative pleading to assert claims under the FTCA and recommended that it be denied. (Dkt. 102).  No objections were filed to the R&R.

On April 26, 2022, Defendants filed their motion for summary judgment.  (Dkt. 86).[3]  Plaintiff filed his opposition on May 16, 2022.  (Dkt. 92).  Defendants filed their reply on June 15, 2022.  (Dkt. 96).  On August 15, 2022, Plaintiff filed a sur-reply in further opposition to Defendants' motion for summary judgment.  (Dkt. 104).  In light of Plaintiff's *pro se* status, the Court has read and considered his sur-reply notwithstanding the fact that it was filed without leave of the Court.

## DISCUSSION

### I.   Plaintiff's Motion to Amend

The Court is not required to review *de novo* those portions of a report and recommendation to which objections were not filed.  *See Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure [to timely] object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.").  Notwithstanding the lack of objections, the Court has conducted a careful review of the R&R, as well as the prior proceedings in the case.

---

[3]     Defendants filed an amended notice of motion and non-substantive corrections to certain of their motion papers the following day (that is, April 27, 2022).  (Dkt. 88).

As an initial matter, the Court agrees with Judge Pedersen's determination that Plaintiff's motion is best construed as a motion to amend the operative pleading to assert claims under the FTCA.  Further, as Judge Pedersen explained, Plaintiff did not comply with the filing and timing requirements of the FTCA, including by ignoring specific instructions provided to him by the Court, and there is no basis for the Court to excuse this failure.  (*See* Dkt. 102 at 5-9).  The Court accordingly adopts the R&R and denies Plaintiff's motion to amend.

## II.   Defendants' Motion for Summary Judgment

### A.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103

(W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

**B.    Standing**

Defendants argue that Plaintiff has no standing to pursue his claims against them because he has not alleged an injury-in-fact.  (Dkt. 86-1 at 12).  "[T]he Court will address this point first, because the Court does not have subject matter jurisdiction to resolve [the other aspects of] defendants' motion [for summary judgment] unless the Court determines that plaintiff has standing to sue." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-0564 BMCPK, 2019 WL 1515231, at *12 (E.D.N.Y. Feb. 21, 2019).

Like all courts established under Article III of the United States Constitution, this Court may only hear "cases and controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992); *see also Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990) ("Article III, of course, gives the federal courts jurisdiction over only 'cases and

controversies. . . .'").  While the Constitution does not define "case" or "controversy," "the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process."  *Whitmore*, 495 U.S. at 155.  The Second Circuit has explained:

> To satisfy the requirements of Article III standing, plaintiffs must demonstrate "(1) [an] injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

*Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (quoting *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 257 (2d Cir. 2013)).  "[T]he standing issue may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment," *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 56 (2d Cir. 2016), and "[t]he determination of whether Article III standing exists . . . must comport with the manner and degree of evidence required at the successive stages of the litigation," *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 142 (2d Cir. 2000) (quotation omitted).  In other words, the Court may always revisit the issue of standing throughout the pendency of a litigation, even if it has concluded that standing exists at an earlier stage of the proceeding.

Defendants contend that Plaintiff cannot satisfy the injury-in-fact requirement of standing because he "has not produced direct or circumstantial evidence that would allow a finder of fact to conclude that Robinson's comments can be traced to a concrete injury suffered by Plaintiff."  (Dkt. 86-1 at 14).  More specifically, Defendants argue that "[t]he

essence of Dean's claim [is] that Robinson 'let the cat out of the bag' about his criminal charges," but that this contention "is directly contradicted by [Plaintiff's] own testimony . . . that his sex offender status was common knowledge and, as a result, he *never* felt safe." (*Id*. at 15).  Based on the current record, the Court is unpersuaded by this argument, for the reasons that follow.

It has long been recognized that, under appropriate circumstances, "threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes." *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003).  In the specific context of threats to inmate safety, courts have recognized the viability of a deliberate indifference claim where "a corrections officer . . . spreads malicious rumors about [an inmate,] if the rumors incited other inmates to assault [him], thereby placing him at grave risk of physical harm." *Mirabella v. Correction Officer O'Keenan*, No. 15-CV-142S, 2016 WL 4678980, at *4 (W.D.N.Y. Sept. 7, 2016) (citation, internal quotation marks, and original alteration omitted); *see also Maldonado v. John*, No. 21-CV-3719 (LTS), 2021 WL 3292575, at *6 (S.D.N.Y. Aug. 2, 2021) (explaining that "the creation of a significant risk of serious harm [by a corrections official spreading rumors about an inmate] violates the constitution whether or not an attack actually occurs" (quotation omitted)); *Johnson v. Philling*, No. CV 12-2523-PHX-RCB (SPL), 2013 WL 2244593, at *3 (D. Ariz. May 21, 2013) ("A supported allegation that a correctional official made statements intending to incite inmates to attack another inmate may state a claim under the Eighth or Fourteenth

Amendment.").[4]  The Supreme Court has further held that an inmate asserting a claim of deliberate indifference is not required "to await a tragic event such as an actual assault before obtaining relief." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (citation and original alterations omitted).   Indeed, Defendants "concede that, under different circumstances, identifying a prisoner as a child molester in an incarcerated setting might create a risk of harm that is sufficiently serious to give rise to a constitutional violation," but contend that the specific circumstances here mean that Plaintiff cannot possibly have been harmed by Defendants' actions.  (*Id*. at 15-16).

It is undisputed in this case that Robinson called Plaintiff a child molester while in the MCJ.   Moreover, Plaintiff testified at his deposition that Robinson screamed that Plaintiff was a "monster," a "rapist," and a "child molester" in the presence of other inmates.  (Dkt. 86-6 at 32-36).   Based on the case law discussed above, and in light of the undisputed background information that inmates charged with sexual crimes against children are more likely to be the victims of inmate-on-inmate violence, *see Mirabella*, 2016 WL 46789880, at *4, this would generally be sufficient to establish an injury-in-fact for standing purposes. The question before the Court, then, is whether Plaintiff's deposition testimony that there was general knowledge of his sex offender status within the MCJ prior

---

[4]     As a federal pre-trial detainee, Plaintiff's deliberate indifference claim arises out of the Fifth Amendment, not the Fourteenth Amendment, as would be the case for a state pre-trial detainee.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment. . . . We see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment.").

to Robinson's comments sufficiently distinguishes this case so as to essentially render Plaintiff injury-proof.  The Court finds that it does not.

The essence of Defendants' argument is that Plaintiff's sex offender status was already so widely known within the MCJ that Robinson's comments could not possibly have increased the risk that he would be assaulted by another inmate on that basis. However, while there is relatively sparse case law directly relevant to Defendants' contention, courts considering claims similar to Plaintiff's have focused on the concepts of incitement and intentional exposure of the plaintiff to an increased risk of attack from other inmates.  *See, e.g., Mirabella*, 2018 WL 3659526, at *3.  Implicit in this analysis is the understanding that inmates are influenced by the attitudes and actions of those in a position of authority over them.  In other words, there is a qualitative difference between knowing generally that a fellow inmate is a sexual offender and witnessing a law enforcement officer derogatorily refer to a fellow inmate as a "child molester" and a "monster," and those two experiences would have different impacts in terms of increasing the likelihood of attack. The Court thus does not find that the particular circumstances of this case identified by Defendants are sufficient to deprive Plaintiff of standing, and will not grant summary judgment on this basis.

### C.  Viability of *Bivens* Claims

As set forth above, Plaintiff has asserted a claim for deliberate indifference to his health and safety against each Defendant, in violation of his rights under the Fifth Amendment.  The Court previously found that these claims could potentially be cognizable pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotic*, 403 U.S.

388 (1971). (*See* Dkt. 17 at 4, 10-15; Dkt. 21 at 2-3).[5]  However, since the commencement of this lawsuit in 2015, the Supreme Court has issued several decisions—including *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017), and *Egbert v. Boule*, __ U.S. __, 142 S. Ct. 1793 (2022)—pursuant to which it has become clear that Plaintiff's claims are not viable under *Bivens*.  The Court accordingly finds that summary judgment in favor of Defendants is warranted.

While 42 U.S.C. § 1983 "entitles an injured person to money damages if a state official violates his or her constitutional rights," Congress has not "create[d] an analogous statute for federal officials.  Indeed, in the 100 years leading up to *Bivens,* Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government." *Ziglar*, 137 S. Ct. at 1854.  "In *Bivens*, the Court held that it had authority to create a cause of action under the Fourth Amendment against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." *Egbert*, 142 S. Ct. at 1802.  "Over the following decade, the Court twice again fashioned new causes of action under the Constitution—first, for a former congressional staffer's Fifth Amendment sex-discrimination claim, *see Davis*

---

[5]      In its earlier decisions, the Court incorrectly referred to the deliberate indifference claims as arising under the Fourteenth Amendment.  (*See, e.g.,* Dkt. 17 at 19).  However, as noted above, the Fourteenth Amendment applies to state pre-trial detainees, while it is the Fifth Amendment that potentially provides such a claim for federal pre-trial detainees. *See Caiozzo v. Koreman*, 581 F.3d 63, 69 & n.3 (2d Cir. 2009) (explaining that claims for deliberate indifference to medical needs of a state prisoner or detainee are properly brought under the Fourteenth Amendment's due process clause, while similar claims by a federal prisoner or federal detainee are properly brought under the Fifth Amendment's due process clause), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).

*v. Passman*, 442 U.S. 228 (1979); and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980)." *Id*.

Since deciding *Carlson* in 1980, the Supreme Court has not implied an additional cause of action under the Constitution. However, federal courts have continued to grapple with what circumstances justify the extension of the *Bivens* remedy. In *Ziglar*, the Supreme Court provided guidance on that point, explaining that "expanding the *Bivens* remedy is now a disfavored judicial activity," and that the key question to be asked "is who should decide whether to provide for a damages remedy, Congress or the courts?" 137 S. Ct. at 1857 (quotations omitted). The *Ziglar* Court further explained that the *Bivens* remedy may not be extended into a new context if there are "special factors counselling hesitation in the absence of affirmative action by Congress," *id*. (citation omitted), and that a context is new "[i]f the case is different in a meaningful way from previous *Bivens* cases" decided by the Supreme Court, *id*. at 1859. A context may be meaningfully different "because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id*. Ultimately, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy[,] the courts must refrain from creating [one]." *Id*. at 1858.

In *Egbert*, the Supreme Court reiterated that "[e]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating . . . a [*Bivens*] remedy." *Egbert*, 142 S. Ct. at 1803 (quotation omitted). "If there is a rational reason to think" that the answer to the question "who should decide whether to provide for a damages remedy, Congress or the Courts?" is Congress, "as it will be in most every case," then "no *Bivens* action may lie." *Id.* (citation omitted). The Supreme Court explained further that "if [it] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Id.* at 1809. As another judge in this Circuit has noted, "the *Egbert* Court made clear that, effectively, [the special factors inquiry] operates as a bar to a *Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth and Eighth Amendment claims factually indistinguishable from *Bivens*, [*Davis*], or *Carlson*." *Cohen v. United States*, No. 21-CV-10774 (LJL), 2022 WL 16925984, at *6 (S.D.N.Y. Nov. 14, 2022); *see also Smith v. Garcia*, No. 21-CV-578 NGG RJR, 2022 WL 17852393, at *7 (E.D.N.Y. Dec. 22, 2022) (same).

Applying these principles to this case, it is apparent that the Court cannot extend the *Bivens* remedy to the context presented here. First, the context is undeniably a new one. The closest comparator is the decision in *Carlson*, where the Supreme Court recognized a claim for violation of the Eighth Amendment due to prison officials' failure to provide medical care for an inmate's asthma. *See* 446 U.S. at 18-23. However, there are several meaningful differences between the instant case and *Carlson*. First, Plaintiff does not assert a claim under the Eighth Amendment. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (noting that because plaintiff was a federal pretrial detainee, the due process

clause of the Fifth Amendment would apply rather than the "'cruel and unusual punishment' proscription of the Eight Amendment").[6]  Second, unlike the defendants in *Carlson*, the defendants in this case did not work within the facility where Plaintiff was confined.   Third, Plaintiff's claims implicate the duty to prevent inmate-on-inmate violence, which was not at issue in *Carlson*.

Because Plaintiff's claims present a new context, the Court must inquire whether there is even one rational reason to defer to Congress as to the availability of a damages remedy.   The answer, "as it will be in most every case," *Egbert*, 142 S. Ct. at 1803, is yes. In particular, the Supreme Court explained in *Ziglar* that "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation."  137 S. Ct. at 1865.   The *Ziglar* Court went on to note that "[s]ome 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995 [the "PLRA"], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court," and thus "Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs."  *Id*.  However, Congress did not "provide for a standalone damages remedy against federal jailers," thus suggesting that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment."  *Id*.; *see also Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 61

---

[6]     *Davis* recognized a cause of action for a violation of rights under the Fifth Amendment, but in the entirely unrelated context of sex discrimination by a member of Congress.

(E.D.N.Y. 2017) ("Congress has been active in the area of prisoners' rights and its actions do not support the creation of a new *Bivens* claim."), *aff'd*, 755 F. App'x 67 (2d Cir. 2018).

In addition, the existence of the FTCA and its associated administrative processes as an alternative avenue of redress is a reason to decline to extend the *Bivens* remedy.  *See Egbert*, 142 S. Ct. at 1804 ("If there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" (quoting *Ziglar*, 137 S. Ct. at 1858)).  It is irrelevant whether that alternative avenue of redress could provide complete relief to Plaintiff—"the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy."  *Id*. (quotation omitted).  In *Egbert*, the Supreme Court "found administrative procedures almost identical to those required prior to filing an FTCA claim with a court to be a sufficient alternative remedy within the special-factors analysis."  *Smith*,  2022 WL 17852393, at *6.

Moreover, "the long tradition of judicial deference to the legislative and executive branch's expertise in prison management also counsels in favor of hesitation."  *Id*. at *7. "Prison administration is . . . a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint."  *Turner v. Safley*, 482 U.S. 78, 85 (1987).

These considerations related to the PLRA, the FTCA, and the difficulties of prison administration lead inexorably to the conclusion that it is Congress, and not this Court, that should  determine  whether  a  damages  remedy  is  available  under  the  circumstances

presented here.   Accordingly, Plaintiff's claims are not cognizable under *Bivens*, and summary judgment must be granted in favor of Defendants.

## **CONCLUSION**

For the foregoing reasons, the Court adopts the Report and Recommendation issued by Judge Pedersen on July 29, 2022 (Dkt. 102), and denies Plaintiff's motion to amend (Dkt. 85).  The Court further grants Defendants' motion for summary judgment (Dkt. 86). The Clerk of Court is directed to enter judgment in favor of Defendants and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: February 16, 2023
         Rochester, New York